UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                        )
MASSACHUSETTS MANUFACTURING             )
EXTENSION PARTNERSHIP, *et al.*,        )
                                        )
        Plaintiffs,                     )
                                        )
    v.                                  )        Civil Action No. 09-0788 (PLF)
                                        )
GARY LOCKE, Secretary,                  )
United States Department of Commerce,   )
                                        )
        Defendant.                      )
_____)


<u>OPINION</u>

   Plaintiffs Massachusetts Manufacturing Extension Partnership ("MassMEP"),

Florida Manufacturing Extension Partnership ("Florida MEP"), and Maine Manufacturing

Extension Partnership ("Maine MEP") allege that the Secretary of the United States Department

of Commerce ("Commerce") has violated the Administrative Procedure Act, 5 U.S.C. §§ 701

*et seq.* ("APA"), in administering the Hollings Manufacturing Extension Partnership Program

("MEP program").  On July 29, 2009, the defendant moved to dismiss the plaintiffs' complaint.

While that motion was pending, the plaintiffs filed an amended complaint.  Because the filing of

the amended complaint rendered the defendant's motion to dismiss moot, the Court will deny

that motion.

   Also pending before the Court are the parties' cross-motions for summary

judgment, which are ripe for review.  After consideration of the parties' arguments, the relevant

authorities, and the entire record in this case, the Court will grant the defendant's motion for

summary judgment in part and deny it in part, dismissing one of plaintiffs' claims as moot and

entering judgment for the defendant as to the remaining claims. The plaintiffs' cross-motion for

summary judgment will be denied.[1]

## I. BACKGROUND

### A. The MEP Program

The National Institute of Standards and Technology ("NIST"), a unit within the

Department of Commerce, "provide[s] assistance for the creation and support of Regional

Centers for the Transfer of Manufacturing Technology [("MEP centers")]." 15 U.S.C. § 278k(a).

These centers, operated by nonprofit affiliates, facilitate the "transfer of manufacturing

technology and techniques developed at [NIST]" to manufacturing companies by disseminating

information about useful technologies and advising businesses on how to improve their

operations by adapting and implementing those technologies. Id. § 278k(a)(1)-(5). The centers

---

[1]     The papers reviewed by the Court in considering these motions include the following: plaintiffs' original complaint ("Compl."); plaintiffs' amended complaint ("Am. Compl."); defendant's motion to dismiss the plaintiffs' complaint ("MTD"); plaintiffs' motion for summary judgment ("PMSJ"); plaintiffs' statement of material facts not in dispute (attached to PMSJ) ("PSMF"); defendant's cross-motion for summary judgment ("DMSJ"); defendant's response to plaintiffs' statement of material facts (attached to DMSJ) ("Def.'s Resp."); defendant's statement of material facts as to which there is no genuine dispute ("DSMF"); plaintiffs' reply in support of their motion for summary judgment ("Pl.'s Reply"); plaintiffs' response to defendant's DSMF ("Pl.'s Resp."); defendant's reply in support of his motion for summary judgment ("Def.'s Reply"); Declaration of Michael J. Simpson (attached to DMSJ) ("Simpson Decl."); Simpson Decl., Ex. 2 (General Terms and Conditions, Hollings Manufacturing Extension Partnership, 2005) ("2005 GTCs"); Simpson Decl., Ex. 3 (General Terms and Conditions, Hollings Manufacturing Extension Partnership, 2009) ("2009 GTCs"); Simpson Decl., Ex. 4 (Operating Plan Guidelines & Format, 2005) ("2005 OPGs"); Simpson Decl., Ex. 5 (Operating Plan Guidelines, 2009) ("2009 OPGs"); Declaration of of Stephen P. O'Rourke (attached to DMSJ) ("O'Rourke Decl."); O'Rourke Decl., Ex. 1 (Final Audit Report, Massachusetts MEP, March 2009) ("2009 MassMEP Audit Report"); O'Rourke Decl., Ex. 2 (Final Audit Report, Florida MEP, March 2009) ("Florida MEP Audit Report"); and Second Declaration of Stephen P. O'Rourke (attached to Def.'s Reply) ("2nd O'Rourke Decl.").

are also designed to secure the "participation of individuals from industry, universities, State governments, other Federal agencies, and, when appropriate, [NIST] in cooperative technology transfer activities." Id. § 278k(a)(2).

The activities of MEP centers are funded by contributions from both the public and private sectors. See 15 U.S.C. § 278k(c)(1)-(3). NIST provides significant financial support to the centers, but the level of that support is limited by statute; if a center has been in operation for more than six years, the maximum amount of annual financial assistance it may receive from NIST is equal to "one third of [its] capital and annual operating and maintenance costs." Id. § 278k(c)(5). The remaining share of the center's budget — the "host share" or "cost share" — must be supplied by the center's "host organization," "a U.S.-based nonprofit institution or organization" that operates the center. See 15 C.F.R. § 290.4(c); id. § 290.3(a). That host organization may raise its share in more than one way: by accepting fees for services and for the licensing of technology, by receiving "dollar contributions from state, county, city, industrial, or other services," or by taking "in-kind contributions." Id. § 290.4(c)(1)-(3). Third parties, such as universities or private businesses, may make in-kind contributions by dedicating full- or part-time personnel to the center's work or by donating equipment, office space, or "other related contributions." Id. § 290.4(c)(5).

Pursuant to a regulation first promulgated by Commerce in 1990 and amended in 1994, a MEP center may fund no more than half of its cost share using in-kind contributions other than full-time personnel ("the in-kind contribution cap"). Id. The other half of its share therefore must derive from either (1) cash or (2) the value of full-time personnel contributed by third-parties. See id. § 290.4(a)(1)-(5). This framework divides the funding for each center's

annual budget into thirds: a third of the center's costs may be paid by NIST; a third may be provided by third parties making in-kind contributions of resources other than full-time personnel; and at least a third must derive from third-party (non-NIST) contributions of either cash or full-time personnel.

MEP centers receive financial assistance from NIST on an annual basis. PSMF ¶ 14; Def.'s Resp. ¶ 14. To do so, each center "develops a draft operating plan for the upcoming funding cycle, which includes the operating budget and all of the proposed agreements between the Center and" third parties ("partners") providing goods, services, and/or contributions to the center. PSMF ¶ 15; Def.'s Resp. ¶ 15. NIST reviews the proposed plan and may recommend revisions. PSMF ¶ 16; Def.'s Resp. ¶ 16. Once the plan has been revised by the center and ultimately approved by NIST, NIST supplies the center's financial assistance award and issues a cooperative agreement that establishes the center's contractual relationship with NIST. PSMF ¶ 17; Def.'s Resp. ¶ 17.

Two policy documents developed and adopted by NIST govern the relationship between the agency and the MEP centers. First, a document called the "MEP Operating Plan Guidelines and Format" describes the "recommended format and details" for the proposed operating plans submitted to NIST each year by the centers. Simpson Decl. ¶ 12; DSMF ¶ 6; Pl.'s Resp. ¶ 6. Second, a set of "General Terms and Conditions" applies to all centers that receive financial assistance awards from NIST. 2009 GTCs at 1; DSMF ¶ 6; Pl.'s Resp. ¶ 6. The Operating Plan Guidelines and the General Terms and Conditions outline and explain such matters as the type of records with which centers must document their cost share and the way in which various third-party partners of the centers should be categorized.

Of particular relevance to this litigation is Commerce's treatment of the term "subrecipient." As defined by NIST's current Operating Plan Guidelines, a "subrecipient" is "the legal entity to which a subaward is made [by a center] and which is accountable to the [center] for the use of the funds provided." 2009 OPG at 18. A subaward is "an award of financial assistance in the form of money, or property in lieu of money, made under an award [from NIST] by [a center] to an eligible subrecipient. . . ." Id. Because a subrecipient receives money or property from a center in exchange for its legal assumption of certain of the center's obligations under its cooperative agreement with NIST, the subrecipient must extensively document its costs and expenditures and submit that documentation to the center, which in turn may be required to provide that documentation to NIST. Id. at 18-19; 2009 GTCs at 8. In contrast, a "third party in-kind contributor" provides "non-cash contributions" such as personnel or equipment to the center, but does not receive cash or property in return. 2009 OPG at 19-20; 2009 GTCs at 7. A third-party in-kind contributor is not subject to the same stringent documentation requirements applicable to subrecipients. See 2009 GTCs at 8.

*B. The Plaintiffs*

Plaintiffs MassMEP, Florida MEP, and Maine MEP are three nonprofit organizations that serve as hosts for a MEP center in each of their respective states. PSMF ¶ 8. Each was formed in the 1990s to participate in the MEP, and since then each has received a financial assistance award from NIST every year. Id. ¶¶ 9-11.

In August of 2006, Commerce's Office of the Inspector General ("OIG") initiated an audit of MassMEP's finances for the period between July 1, 2005 and June 30, 2006. PSMF ¶ 38. OIG issued its final report on the audit in March of 2009. See 2009 MassMEP Audit

Report at 1.  According to OIG, the audit showed that MassMEP had "received $1,294,073 in excess federal funding" during the fiscal year in question.  Id. at 2.  OIG reached that conclusion based in part on its finding that roughly $4.2 million in program costs allegedly incurred by subrecipients could not be substantiated by proper documentation.  Id. at 1.  OIG recommended that Commerce recover the $1.3 million in "excess federal funding" from MassMEP.  Id. at 16.

In May of 2007, OIG initiated an audit of Florida MEP's finances for the period beginning on July 1, 2005, and ending on March 31, 2007.  PSMF ¶ 39.  The report containing the results of that audit, like the report on the audit of MassMEP, was issued in March of 2009.  See Florida MEP Audit Report at 1.  OIG concluded, among other things, that Florida MEP had claimed approximately $11.4 million in costs incurred by subrecipients that could not be verified by appropriate documentation.  Id. at 2.  Because of that and other errors, Florida MEP had, by OIG's calculation, received "$2,868,393 in excess federal funds" recoverable by Commerce.  Id.

Unlike its co-plaintiffs MassMEP and Florida MEP, Maine MEP does not claim to have been subject in recent years to an unfavorable audit by OIG.  Nevertheless, it asserts an interest in the regulation of the MEP program by Commerce.  See Am. Compl. ¶ 15.

### C.  Procedural Posture

The plaintiffs filed their initial complaint on April 30, 2009.  All three plaintiffs alleged that (1) Commerce had failed to promulgate regulations "compliant with . . . 15 U.S.C. § 278k," Compl. ¶ 80; (2) Commerce had "improperly defined Plaintiffs' partners' as 'subrecipients' and disqualified those partners' contributions on the ground that the partners do not meet federal accounting cost principles applicable to recipients," id. ¶ 86; (3) the audit reports concerning the finances of MassMEP and Florida MEP "reflect an arbitrary, capricious,

and unreasonable interpretation" of applicable statutory provisions, id. ¶ 95; and (4) Commerce

had breached its cooperative agreements with the plaintiffs by "seeking . . . to disrupt Plaintiffs'

relations with their partners." Id. ¶ 100. Commerce responded by filing a motion to dismiss in

which it stated that the first three counts of the plaintiffs' complaint related to the MassMEP and

Florida MEP audit reports, which were not yet final agency action and so not subject to review

under the Administrative Procedure Act. MTD at 1. The defendant also argued that the Court

lacked jurisdiction over the plaintiffs' breach of contract claim. Id. at 2.

        In response, the plaintiffs, without objection from the defendant, filed an amended

complaint presenting significantly different claims. Instead of openly challenging the audit

reports, the plaintiffs allege in the amended complaint that Commerce "is enforcing reporting

requirements on the MEP centers that are significantly more burdensome" than regulations

dictate, Am. Compl. ¶ 69, and is "imposing financial management and other standards applicable

to subrecipients on plaintiffs' partnering organizations, even when those partnering organizations

are not receiving a subaward." Id. ¶ 72. They also allege that Commerce has violated the APA

by "den[ying]" the plaintiffs "a proper and lawful interpretation of the America COMPETES

Act," and that Commerce's in-kind contribution cap is invalid in light of that statute. Am.

Compl. ¶¶ 66, 78. A fifth claim, Count IV of the Amended Complaint, has since been

abandoned by the plaintiffs. See id. ¶¶ 74-76; Pl.'s Reply at 2 n.1. The plaintiffs request

declaratory and injunctive relief. See Am. Compl. at 22. The parties have filed cross-motions

for summary judgment.

## II.  DISCUSSION

The plaintiffs make four main arguments in their motion for summary judgment:
(1) the in-kind contribution cap imposed by Commerce in its regulations, see 15 C.F.R.
§ 290.4(c)(5), is facially invalid in light of legislation passed by Congress in 2007, PMSJ at 15;
(2) NIST has violated its own regulations by "impos[ing] upon the Centers unduly burdensome
recordkeeping requirements," id. at 20; (3) NIST unlawfully "expanded the definition of
subrecipient in a manner that threatens to harm Florida MEP and MassMEP in their pending
audit resolutions, id. at 24; and (4) Commerce "has adopted an interpretation [of statutory law
that is] of general applicability, without publication in the *Federal Register*" in violation of the
Freedom of Information Act, 5 U.S.C. § 552.  Id. at 13.  Also included in the plaintiffs' motion or
their reply memorandum are three arguments that do not appear to be based on claims made in
the amended complaint at all: (1) Commerce has adopted documentation requirements without
engaging in notice-and-comment proceedings, in violation of the APA, id. at 24-25;
(2) Commerce has imposed a new definition of "subrecipient" on the plaintiffs without engaging
in notice-and-comment proceedings, in violation of the APA, id.; and (3) Commerce's initial
adoption of the in-kind contribution cap was arbitrary and capricious.  Pl.'s Reply at 11-13.  Even
if properly before the Court, none of these claims has merit.

### A. Claims Challenging the In-Kind Contribution Cap
### (Count I of Plaintiffs' Amended Complaint)

1.  The Validity of NIST's Policy of Enforcing the In-Kind Contribution Cap

The plaintiffs argue that the in-kind contribution cap imposed by 15 C.F.R.
§ 290.4(c)(5) was invalidated by the America COMPETES Act of 2007, Pub. L. No. 110-69, 121

Stat. 572, and that NIST's continued enforcement of the regulation "is arbitrary, capricious, an abuse of discretion, and an action not in accordance with law," in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A).  See Am. Compl. ¶¶ 66-67.

As an initial matter, the Court notes that the agency action challenged by the plaintiffs is the enforcement, not the adoption, of the regulation in question.  The rule now codified at 15 C.F.R. § 290.4(c)(5) was finalized in its present form in 1994, long before the passage of the America COMPETES Act ("ACA"), and any challenge to the adoption of that rule would now be untimely.  See infra at 15-16.  As a result, the agency action challenged by the plaintiffs must instead be the agency's policy of continuing to enforce the rule after and in spite of the passage of the ACA.  That the agency has such a policy is undisputed.

NIST's regulation provides:

> The host organization [of a MEP center] may count as part of its share:
>
> * * *
>
> (5) In-kind contribution of part-time personnel, equipment, software, rental value of centrally located space . . . and other related contributions up to a maximum of one-half of the host's annual share.

15 C.F.R. § 290.4(c)(5).  According to the plaintiffs, that regulation was nullified by the following provision of the ACA, which amended the statute governing the MEP Program:

> In meeting [its cost share] requirement, it is anticipated that a Center will enter into agreements with other entities such as private industry, universities, and State governments to accomplish programmatic objectives and access new and existing resources that will further the impact of the Federal investment made on behalf of small- and medium-sized manufacturing companies. *All non-Federal costs, contributed by such entities and determined by*

*a Center as programmatically reasonable and allocable under
MEP program procedures are includable as a portion of the
Center's contribution.*

Pub. L. No. 110-69, § 3003(a)(3)(C), 121 Stat. at 587 (now codified at 15 U.S.C.

§ 278k(c)(3)(C)) (emphasis added).  The plaintiffs insist that the "plain language" of the second

sentence of that provision invalidates the in-kind contribution cap established by the regulations.

PMSJ at 15.  The defendant, of course, disputes that reading of the statutory provision and argues

that "NIST's interpretation of Section 3003(a)(3)(C) is fully consistent with the [in-kind

contribution cap] and is the only reasonable interpretation of the provision at issue."  DMSJ at 6.

In advancing their conflicting interpretations of Section 3003, both the plaintiffs

and the defendant rely on the framework established in Chevron U.S.A., Inc. v. Natural Res.

Defense Council, Inc., 467 U.S. 837 (1984), for evaluating those agency interpretations of

statutory language that carry the force of law.  See PMSJ at 15-16; DMSJ at 4-5.  The Court,

however, is not persuaded that Chevron is applicable here, because Commerce has never issued

any sort of final statement interpreting the relevant language of Section 3003; the only explicit

interpretations offered on behalf of the defendant are litigating positions, which do not

necessarily merit Chevron deference.  See, e.g., Louisiana Fed. Land Bank v. Farm Credit

Admin., 336 F.3d 1075, 1083 (D.C. Cir. 2003) ("[W]e would not defer to the mere litigating

position of agency counsel.").  Of course, NIST's continuing enforcement of the in-kind

contribution cap could be consistent with an implicit agency determination that Section 3003 has

not invalidated the cap — but such continuing enforcement would also result if the agency had

never even considered the possibility that the ACA conflicts with the regulation. In other words, the agency's behavior could reflect an implicit interpretation of the statute, or no interpretation at all.

Fortunately, to resolve the issue at hand, the Court need not determine the level of deference to be accorded to the interpretations offered by agency counsel in the absence of any authoritative act of interpretation by the agency itself. "[T]he result is the same whether the [C]ourt applies *de novo* review, deference under Skidmore v. Swift & Co., 323 U.S. 134 (1944), or Chevron deference; the text of [Section 3003] as well as the statutory structure and legislative history . . . support" the conclusion that ACA does not invalidate the in-kind contribution cap. Bullcreek v. Nuclear Regulatory Comm'n, 359 F.3d 536, 541 (D.C. Cir. 2004) (citations omitted).

To support their argument that Section 3003(a)(3)(C) of the ACA invalidates the in-kind contribution cap, the plaintiffs largely ignore portions of the text and focus only on the following language: "All non-Federal costs . . . are includable as a portion of the Center's contribution." See, e.g., Pl.'s Reply at 8 (referring to this expurgated version of the statutory text as the provision's "base sentence"). According to the plaintiffs, "[t]he key word" in the provision "is 'all,'" meaning "'the whole amount, quantity, or extent of.'" Id. at 5. The plaintiffs insist that, by providing that "all non-Federal costs" incurred by a MEP center's partners are "includable as a portion of the Center's contribution," Congress eliminated "any limitation on such costs imposed by Commerce" through its regulations. PMSJ at 16.

This tortured reading of the statutory text is unpersuasive. Section 3003(a)(3)(C) does not, in fact, state that "'all' partner MEP costs, without qualification, count as matching

costs." PMSJ at 16.  Instead, the statute imposes a significant limitation on includable costs, defining them as those "contributed by [third parties] and determined by a Center as *programmatically reasonable and allocable under MEP program procedures*."  § 3003(a)(3)(C), 121 Stat. at 587 (emphasis added).  The italicized phrase appears on its face to mean that Congress did not intend to alter current practice or exempt any contributions from existing "MEP program procedures."  A "procedure" is "a particular way of doing or of going about the accomplishment of something" or "a traditional, customary or otherwise established or accepted way of doing things."  WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1807 (1993).  An in-kind contribution cap has been a part of NIST's "established or accepted way" of administering financial assistance to MEP centers since 1990, just two years after formation of the centers was first authorized by Congress.  See Pub. L. No. 100-418, § 5121(a) (1988) (directing that NIST "shall provide assistance for the creation and support of Regional Centers for the Transfer of Manufacturing Technology"); 55 Fed. Reg. 38,275, 38,277 (Sept. 17, 1990) (limiting the percentage of a center's cost share that may derive from in-kind contributions from third-parties).  Under longstanding "MEP program procedures," then, in-kind contributions in excess of the cap could not be termed "reasonable" if included as "a portion of the Center's" cost share, nor are they capable of being allocated as matching funds to a NIST financial assistance award.  The language of Section 3003(a)(3)(C) of the ACA made no change in these procedures and is perfectly consistent with them.

The plaintiffs attempt to escape this logic by arguing that the terms "reasonable" and "allocable" relate only to the cost principles established by the Office of Management and Budget ("OMB") to govern grants provided to nonprofit organizations by federal agencies.  See

Pl.'s Reply at 9 (citing OMB Circular A-122, Cost Principles for Non-Profit Organizations (codified at 2 C.F.R. §§ 230.5-230.50 & apps.)). Because the OMB principles apply to all federal agencies, they of course do not incorporate Commerce's particular regulatory limitations on matching funds. At the same time, contrary to the plaintiffs' conclusory assertions, there is no reason to suppose that Section 3003(a)(C)(3) of the ACA subjects in-kind contributions only to the general limitations established by OMB; indeed, the statutory text plainly states that the contributions are to be "reasonable and allocable *under MEP program procedures*," indicating that reasonableness and allocability must be determined in view of the rules governing the MEP program in particular.[2]

The broader statutory context of Section 3003 of the ACA confirms that the in-kind contribution cap remains intact. As noted, such a cap has been in place for twenty years — almost since regional MEP centers were first created. Given the cap's established place in the framework governing the MEP program, a statute abolishing the cap altogether would effect a major substantive change in the program. But there is no indication that Congress through Section 3003 intended to institute such a significant change, and the evidence that does exist suggests that Congress had no such intention. The title of the provision in question is "Clarification of Eligible Contributions in Connection with Regional Centers Responsible for Implementing the Objectives of the [MEP] Program." § 3003(a), 121 Stat. at 587. It is unlikely that a statutory revision overturning a twenty-year-old regulation would be termed a mere

---

[2]    In any event, OMB's cost principles also recognize the need to determine the reasonableness of costs by reference to all applicable agency regulations: "In determining reasonableness of a given cost, consideration shall be given to . . . [t]he restraints or requirements imposed by . . . Federal and State laws and regulations." 2 C.F.R. app. A(3)(b).

"clarification."  See, e.g., Henning v. Union Pacific R.R. Co., 530 F.3d 1206, 1216 (10th Cir.

2008) (labeling of a statutory amendment as a "clarification" "indicates Congress sought to

resolve an ambiguity rather than effect a substantive change").

   In fact, in proposing an amendment to the ACA that contained the provision at

issue here, Senator Olympia Snowe indicated that the language was meant to approve,

reemphasize, and clarify the propriety of NIST's treatment of the matching funds requirement:

> [NIST has], in the past, properly considered cost share
> requirements to have been met when centers partnered or entered
> into other agreements with other organizations meeting the needs
> of American manufacturers.
>
> This amendment clarifies and reemphasizes that such
> agreements and partnerships, and the money spent by those
> organizations assisting American manufacturers, clearly are to be
> considered proper cost share as long as the partnering organization
> is meeting the programmatic objectives for assistance to be
> provided to American manufacturers as set for the Hollings
> Manufacturing Partnership Program.

153 Cong. Rec. S5073, S5074 (Apr. 25, 2007) (statement of Sen. Snowe).  Senator Snowe thus

indicated that she intended the proposed language to make clear that partner costs are a "proper"

source of "cost share," but she nowhere suggested that the amendment was meant to effect a

change in NIST's treatment of third-party costs.  Instead, she said that NIST had "properly

considered" the role of third-party costs in meeting "cost share requirements" in the past.  Id.

   Senator Snowe's reference to her desire to "clarif[y] and reemphasize" that third-

party costs may be a source of cost share raises an obvious question: Why did that proposition

require additional emphasis?  Attempting to answer that question, the plaintiffs have suggested

that Senator Snowe's amendment to the ACA was intended to "resolve[] an interpretative

conflict between NIST and [Commerce's Office of the Inspector General] about whether partner

costs are categorically eligible as matching costs." Pl.'s Reply at 4. Based on the plaintiffs'

submissions, it appears that NIST once overruled OIG's conclusion, reached during an audit of

MassMEP, that a subrecipient's expenditures cannot be attributed to the recipient MEP center as

part of its cost share. See PSMF, Ex. 5 at 5; id., Ex. 4 at 3. That incident does not appear to have

related in any way to the in-kind contribution cap, however, and was not referenced by Senator

Snowe. As a result, even if the "conflict" did motivate Senator Snowe to propose her

amendment to the ACA — and there is no evidence that it did — that fact provides no support

for the plaintiffs' argument that the amendment was meant to eliminate the cap. Indeed, the

plaintiffs have produced no evidence or authority indicating that the cap was controversial at the

time the ACA was adopted, or that Congress was even aware of or concerned about it.

Because the text, structure, and history of the ACA indicate that NIST's in-kind

contribution cap in no way conflicts with the statute, NIST's policy of continuing to enforce the

cap is not arbitrary, capricious, or in violation of law. The Court therefore rejects the plaintiffs'

contention that the policy should be vacated under the APA and will enter judgment for the

defendant with regard to Count I of the amended complaint.

### 2. Plaintiffs' Challenge to the Rule Establishing the Cap

In addition to their claim that the continuing enforcement of the in-kind

contribution cap is arbitrary, capricious, or not in accordance with law, the plaintiffs have

belatedly declared that the rule creating the cap, 15 C.F.R. § 290.4(c)(5), is arbitrary and

capricious because "NIST has never provided an explanation for the cost cap." Pl.'s Reply at 12.

This claim fails on two levels. First, it appears nowhere in the plaintiffs' complaint and was first

raised in the plaintiffs' reply brief. "[I]t is a well-settled prudential doctrine that courts generally

will not entertain new arguments first raised in a reply brief." Aleutian Priblof Islands Ass'n, Inc. v. Kempthorne, 537 F. Supp. 2d 1, 12 n.5 (D.D.C. 2008) (citing Herbert v. Nat'l Acad. of Sciences, 974 F.2d 192, 196 (D.C. Cir. 1992)).

Second, even if the Court were inclined to overlook the plaintiffs' failure to raise this claim in either their amended complaint or in their motion for summary judgment, the claim would nevertheless be barred by the applicable statute of limitations. Plaintiffs purport to raise this claim under the Administrative Procedure Act, which permits judicial review of "final agency actions." 5 U.S.C. § 704. Claims brought under the APA "must be commenced within six years after the right of action first accrues." Harris v. FAA, 353 F.3d 1006, 1009 (D.C. Cir. 2004) (citing 28 U.S.C. 2401(a)). "The right of action first accrues on the date of the final agency action." Id. In a case challenging an agency regulation, the relevant "final agency action" is the agency's promulgation of the final rule. See, e.g., Center for Law & Educ. v. U.S. Dep't of Educ., 209 F. Supp. 2d 102, 110 n.9 (D.D.C. 2002) ("final agency action" with regard to an agency rulemaking is "typically the promulgation of the final rule"). Thus, to challenge Commerce's promulgation of the rule implementing the in-kind contribution cap, the plaintiffs must have filed that challenge in court no more than six years after the final rule was published.

The final rule implementing the in-kind contribution cap in its current form was published in the *Federal Register* on May 2, 1994. See 59 Fed. Reg. 22,505 (May 2, 1994). The time for bringing a challenge to the rule under the APA has long passed, and for that reason the plaintiffs' claim must fail.

### B.  Documentation Requirements for Third-Party Personnel
### (Count II of Plaintiffs' Amended Complaint)

The plaintiffs claim that Commerce has violated its own regulations by requiring the centers to produce detailed records documenting the work performed for the centers by employees of third-party contributors.  See PMSJ at 20-22.  Because that claim is moot, it will be dismissed.

"'[W]hen the issues presented [in a case] are no longer 'live' or the parties lack a legally cognizable interest in the outcome,'" the case is moot and hence nonjusticiable.  Ramirez v. U.S. Customs & Border Protection, Civil Action. No. 07-65, 2010 WL 1783265, at *8 (D.D.C. May 5, 2010) (quoting U.S. Parole Comm'n v. Geraghty, 445 U.S. 388, 396 (1980)).  "A case is moot when the challenged conduct ceases such that there is no reasonable expectation that the wrong will be repeated," and the circumstances are such that "it becomes impossible for the court to grant any effectual relief whatever to the prevailing party."  United States v. Philip Morris USA, Inc., 566 F.3d 1095, 1135 (D.C. Cir. 2009) (internal quotation marks and citations omitted).

The documentation requirement challenged by the plaintiffs is set out in the 2005 version of the General Terms and Conditions ("GTCs") that govern NIST's award agreements with recipients of MEP financial assistance.  Under the 2005 GTCs, any MEP center including the value of donated personnel time as part of its cost share was required to produce a list of the contributed personnel that detailed the dates, hours, and nature of work performed for the center.  2005 GTCs at 5.  The center was also instructed to document the salary and benefits of those personnel, and to submit certified records of time and attendance.  Id.  According to the plaintiffs, these documentation requirements are unduly rigid and are "driving MEP Partners

away from the [MEP] program" because those partners "would have to implement new systems from scratch to provide these records to the Centers."  PMSJ at 22.  The plaintiffs ask the Court to issue a declaratory judgment stating that the documentation requirements contained in the 2005 GTCs are "invalid."  Am. Compl. ¶ A.

After the commencement of this litigation, in November of 2009, Commerce released a new set of GTCs containing revised requirements for the documentation of personnel time contributed by third parties.  See 2009 GTCs.  Those revised GTCs entirely omit the requirements from the 2005 GTCs complained of by the plaintiffs and, in their place, specify that MEP centers must submit documentation stating "[t]he value of each third party in-kind contribution."  Id. at 8.  The plaintiffs appear to have no substantive objection to these revised documentation requirements, see Pl.'s Reply at 13, but instead argue that the 2005 GTCs remain in effect because they are incorporated by reference into the plaintiffs' existing award agreements with NIST.  Id. at 14.  In response to that contention, Commerce sent each plaintiff a document entitled "Clarification and Unilateral Amendment."  See 2nd O'Rourke Decl., Exs. 4-6.  That document explicitly stated that the centers' award agreements now are governed solely by the 2009 version of the GTCs.  See id.

As a result of those developments, the plaintiffs' documentation claim has become moot.  The challenged policy embodied in the 2005 GTCs is no longer in force.  Any opinion on the validity of that policy now issued by the Court would be purely advisory, except as it might have an impact on the ongoing audits of FloridaMEP and MassMEP.  The plaintiffs are not entitled to any decision on the merits of those audits, however, since the audits have not yet culminated in any final agency action, see 5 U.S.C. § 704; MTD at 8-11 (explaining that the

audit reports are subject to further review and revision by Commerce officials), and the plaintiffs have abandoned their claims challenging the results of the audits, presumably in light of their lack of finality.  See supra at 6.  Because the Court could not provide any effective relief to the plaintiffs with regard to this claim, it is moot, and Count II of the amended complaint will be dismissed.

### C.  Commerce's Use of the Term "Subrecipient"
### (Count III of Plaintiffs' Amended Complaint)

In its reports on the audits of MassMEP and Florida MEP for the 2005 to 2006 and 2005 to 2007 periods, respectively, OIG found that multiple entities categorized as subrecipients by the centers had failed to produce sufficient documentation of their costs, with the result that those costs were "unallowable" and should not be considered as a portion of the centers' matching funds.  2009 Florida MEP Audit Report at 4; see 2009 MassMEP Audit Report at 2.  The plaintiffs now claim that at least some of those entities whose documentation was found lacking by OIG did not, in fact, fit the definition of "subrecipient" contained in Commerce's regulations because the entities received neither money nor property in lieu of money from any MEP center.  PMSJ at 23-24.  According to the plaintiffs, NIST officials nevertheless instructed the centers to classify those entities as subrecipients, triggering heightened documentation requirements and ultimately causing OIG to recommend the disallowance of the entities' costs when those documentation requirements were not met.  Id.  Thus, the failure of these miscategorized subrecipients to produce the documentation sought by OIG was really NIST's fault, not that of the centers.  See id. at 24.

Based on the foregoing line of argument, the plaintiffs argue that "NIST [has] wrongly expanded the definition of subrecipient, in a manner that still threatens to harm Florida MEP and MassMEP in their pending audit resolutions." PMSJ at 24. They urge the Court to "[d]eclare that the imposition of financial management standards and other mandatory subrecipient requirements . . . on those partners of plaintiffs that do not receive a subaward is contrary to law." Am. Compl. ¶ B.

The most obvious problem with plaintiffs' argument is that it does not present the Court with a reviewable agency action. Under the Administrative Procedure Act, this Court may review only "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. To qualify as "final" within the meaning of the APA, an action must meet two requirements: First, it "must mark the consummation of the agency's decisionmaking process — it must not be of a merely tentative or interlocutory nature. . . . [S]econd, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." Bennett v. Spear, 520 U.S. 154, 177-78 (1997). Here, none of the actions identified by the plaintiffs as part of Commerce's supposed redefinition of the term "subrecipient" meets those requirements.

In a declaration submitted by the plaintiffs, Cynthia Adams, an employee of the company that serves as a "managing agent" for the three plaintiff MEP centers, avers that she was informed during a 2005 conference call with various NIST employees that any MEP partner receiving "anything of value" from a MEP center should be characterized by the centers as a subrecipient. Adams Decl. ¶ 23. She also states that in 2005 she received an email from a NIST employee who told her that "if there is anything of value being provided" by a MEP center to a

third party, the relationship between the two entities should be governed by a subrecipient agreement.  Id. ¶ 24.  To bolster Ms. Adams' statements, the plaintiffs also point to NIST's 2005 Operating Plan Guidelines, which explain that "[i]f a subrecipient is not receiving funds from the Center it must receive something of value . . . .  The property, or something else of value, provided in lieu of funds to the subrecipient must be valued in accordance with" specific requirements identified by the agency.  2005 OPGs at 10-11.

This scattering of agency commentary does suggest that in 2005 at least some NIST employees were suggesting that an entity could qualify as a subrecipient if it received something other than money or property from a center — an idea arguably inconsistent with the definitions set out in the applicable regulations.  See 15 C.F.R. § 14.2.  But there is no reason to believe that any of this commentary represented "final agency action" that could trigger judicial review under the APA.  Even if these comments were the agency's final word with regard to the definition of "subrecipient" — a proposition that seems dubious — they certainly did not determine "rights or obligations," or create necessary "legal consequences."  Bennett v. Spear, 520 U.S. at 178.

To reach that conclusion, the Court follows "two lines of inquiry."  Center for Auto Safety v. Nat'l Highway Traffic Safety Admin., 452 F.3d 798, 806 (D.C. Cir. 2006) (citation and internal quotation marks omitted).  First, the Court "considers the effects of the agency's action, inquiring whether the agency has (1) impose[d] any rights or obligations, or (2) genuinely [left] the agency and its decisionmakers free to exercise discretion."  Id. at 806 (citation and internal quotation marks omitted; alterations in original).  Second, the Court examines "the agency's expressed intentions" by evaluating three factors: "(1) the [a]gency's

own characterization of the action; (2) whether the action was published in the Federal Register or the Code of Federal Regulations; and (3) whether the action has binding effects on private parties or on the agency." Id. (citation and internal quotation marks omitted).

Evaluated along the two lines of analysis described above, the statements made by individual NIST employees — one during a conference call, the other in an email to Cynthia Adams — fall far short of final agency action. First, there is no evidence that those statements had the effect of imposing obligations on the plaintiffs. The plaintiffs have not alleged or produced evidence indicating that they would have faced adverse consequences — or indeed, any consequences at all — if they had disputed the definition of subrecipient implied by the NIST employees or if they had opted to use a narrower definition in structuring their relationships with third parties. Second, the context in which those statements were presented indicates that the statements were meant to guide the plaintiffs, not to bind them. The statements were made in informal settings and were not made publicly available, suggesting that they were not intended to create or encapsulate official agency policy. Indeed, there is no indication whatsoever that the statements constituted anything more than "general statements of policy," which do not rise to the level of final agency action and therefore are unreviewable. Center for Auto Safety v. Nat'l Highway Traffic Safety Admin., 452 F.3d at 807.

Similarly, the 2005 Operating Plan Guidelines do not bear the indices of an agency action creating legal consequences. The Guidelines describe themselves as "a 'living document'" that "can (and probably will) be revised to reflect Center needs." 2005 OPGs at 6. They provide "a recommended procedure for creating the annual MEP Center Operating Plan" — they do not purport to codify legal obligations or even offer definitive guidance, only a

"recommended procedure." They do not claim "to carry the force of law." Center for Auto Safety v. Nat'l Highway Traffic Safety Admin., 452 F.3d at 808. They do not prescribe any consequences for a center that classifies as a subrecipient only those entities receiving money or property, instead of "anything of value." They specify that final approval of operating plans is left to a grants officer and do not purport to confine the discretion of that officer. 2005 OPGs at 11. They were not published in the *Federal Register* or the *Code of Federal Regulations*. In short, there is every indication that the Guidelines are just that, guidelines — "a general statement of policy rather than a binding rule." Center for Auto Safety v. Nat'l Highway Traffic Safety Admin., 452 F.3d at 810.

The plaintiffs allege in their amended complaint that, based on guidance from NIST, they "'converted' substantially all of their relationships with their partners to subrecipient agreements, even though the would-be subrecipients were not receiving any part of the plaintiffs' federal award in the form of money or property," and that NIST then approved those subrecipient agreements. Am. Compl. ¶ 45. This allegation does not affect the Court's analysis. "[V]oluntary compliance" with nonbinding agency guidelines "is not enough to establish that the guidelines have had *legal* consequences"; the record must show that the agency in effect forced compliance by taking the challenged actions. Center for Auto Safety v. Nat'l Highway Traffic Safety Admin., 452 F.3d at 811 (emphasis in original). There is absolutely no evidence of such forced compliance in the record here. Because the plaintiffs have failed to challenge "final agency action," the Court will enter judgment for the defendant on Count III of the plaintiffs' complaint.

*D. Procedural Challenges to Documentation Requirements and Categorization of Subrecipients*

The plaintiffs have included in their motion for summary judgment two claims that do not appear anywhere in their amended complaint: a claim that NIST's documentation requirements as reflected in the 2005 General Terms and Conditions are invalid because NIST failed to submit them for notice and comment, and a claim that NIST's use of the term "subrecipient" is invalid for the same reason.  See PMSJ at 24-25.  Because these claims are not included in the plaintiffs' complaint, they are not properly before the Court and are rejected.  See, e.g., Sieverding v. U.S. Dep't of Justice, 693 F. Supp. 2d 93, 101 n.3 (D.D.C. 2010); see also Hoai v. Vo, 935 F.2d 308, 314 n.7 (D.C. Cir. 1991).  In the alternative, these claims must fail for the same reasons that the plaintiffs' claims on the merits with regard to these issues fail — because the claim regarding documentation requirements is moot, and the claim regarding the term "subrecipient" does not concern final agency action as required by the APA.

*E.  Plaintiffs' Freedom of Information Act Claim*
*(Count V of Plaintiffs' Amended Complaint)*

Finally, the plaintiffs argue that Commerce violated the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552(a)(1)(D), because it announced an interpretation of the America COMPETES Act during the course of this litigation that it had not previously published in the *Federal Register*.  Under the FOIA, agencies are required to "state and currently publish in the Federal Register for the guidance of the public . . . . substantive rules of general applicability adopted as authorized by law, and statements of general policy or interpretations of general applicability formulated and adopted by the agency."  5 U.S.C. § 552(a)(1)(D).  The plaintiffs contend that Commerce has interpreted the America COMPETES Act to make no "substantive[]

change [in] the meaning of the MEP statute," and that the agency was required to publish that interpretation in the *Federal Register*. PMSJ at 8, 13-14. The plaintiffs are not entitled to bring this claim, however, because they cannot satisfy all of the elements of a cognizable FOIA claim.

Under the FOIA, "[e]xcept to the extent that a person has actual and timely notice of the terms thereof, a person may not in any manner be required to resort to, or be adversely affected by, a matter required to be published in the Federal Register and not so published." 5 U.S.C. § 552(a)(1). In other words, to make out a claim under the statute, a litigant must demonstrate that it has been "adversely affected" by an unpublished policy that should have been published, and that the litigant did not have actual notice of the content of that policy. See Alliance for Cannabis Therapeutics v. Drug Enforcement Admin., 15 F.3d 1131, 1136 (D.C. Cir. 1994); Fla. Dep't of Health & Rehabilitative Servs. v. Sullivan, Civil Action No. 88-3462, 1991 WL 193532, at *4 n.16 (D.D.C. May 31, 1991). In this case, the plaintiffs contend that if they had known two years ago — when the ACA first became law — that "Commerce would . . . interpret sections [of the statute] to have no effect on the MEP program, they would have planned their strategy much differently, *i.e.*, by immediately seeking redress in the courts and Congress." PMSJ at 14. This conclusory assertion utterly fails to establish that the plaintiffs did not have actual notice of Commerce's interpretation of the ACA or that they suffered adverse effects because Commerce did not publish a notice in the *Federal Register* announcing that the agency did not interpret the ACA to make major changes to the MEP program.

The only specific disagreement with Commerce's interpretation of the ACA presented by the plaintiffs to this Court concerns the effect of the ACA on the in-kind contribution cap. But the plaintiffs have always had actual knowledge of Commerce's

interpretation of the ACA as it relates to the cap, because the agency has continuously enforced the cap even after the passage of the ACA. The record does not indicate that Commerce ever suggested to the plaintiffs or to anyone else that the ACA might invalidate the cap. Because the plaintiffs therefore had actual notice of Commerce's understanding of the ACA as it related to the contribution cap, they cannot make out a claim under FOIA.

Furthermore, even if the plaintiffs were unaware of the agency's views, they were in no way adversely affected by the lack of commentary regarding the ACA published in the *Federal Register*. The plaintiffs were free at any time to "seek redress in the courts and Congress"; no action of the agency stopped them from doing so. Even if the plaintiffs had pled their case in court or lobbied Congress at an earlier date, there is no reason to believe that they would have met with any success. Their claims in this lawsuit lack merit, and would have lacked merit if they had been brought two years ago. The plaintiffs have failed to specify what "redress" they would or could have sought from Congress, and they certainly have produced no evidence to suggest that they would have received any such congressional relief. Because the plaintiffs cannot satisfy the requirements of FOIA, the Court will enter judgment for the defendant on Count V of the amended complaint.

III.  CONCLUSION

For the foregoing reasons, the Court will grant in part and deny in part the defendant's motion for summary judgment.  It will dismiss Count II of the plaintiffs' complaint as moot and enter judgment for the defendant as to all other claims.  Plaintiffs' motion for summary judgment will be denied in its entirety.  An Order consistent with this Opinion shall issue this same day.

SO ORDERED.


/s/_____
PAUL L. FRIEDMAN
United States District Judge

DATE:   July 7, 2010